**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dayshaun Darion Conner, | No. CV-23-02525-PHX-JAT (JZB) |
| Plaintiff, | **ORDER** |
| v. | |
| Christopher Carter, et al., | |
| Defendants. | |

Self-represented Plaintiff Dayshaun Darion Conner brought this civil rights action under 42 U.S.C. § 1983 against correctional officers Kimo Taylor, Christopher Carter, and Christian Alfaro. Defendants move for summary judgment on the merits of Plaintiff's Eighth Amendment excessive force claim, and on qualified immunity grounds. (Doc. 103). The Motion is fully briefed. (Docs. 103–04, 107–110).[1] The Court now rules.

## I.      BACKGROUND

Plaintiff, who was confined at the Arizona State Prison Complex-Lewis ("ASPC-Lewis"), filed his initial Complaint on December 5, 2023. (Doc. 1). After several amendments, Plaintiff filed his operative Third Amended Complaint ("TAC") on January 28, 2025. (Doc. 19). In the TAC, Plaintiff asserts a single Eighth Amendment excessive force claim against Defendant Sergeant Kimo Taylor, Defendant Corporal Christopher Carter, and Defendant Correctional Officer II Christian Alfaro. Plaintiff alleges that during an incident on October 12, 2023, Defendant Taylor placed him in a chokehold on two

---

[1] Plaintiff was issued a *Rand* warning. (*See* Doc. 106).

occasions while he was restrained, Defendant Alfaro tased him while he was restrained, and Defendant Carter struck him with a closed fist and applied body weight to his head and neck while he was restrained. (Doc. 19 at 3–5). Plaintiff seeks compensatory and punitive damages. (Doc. 19 at 6).

Defendants now move for summary judgment on the merits, arguing that (1) Plaintiff's claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), in light of Plaintiff's aggravated assault conviction arising from the same incident; (2) Plaintiff's allegations are contradicted by video evidence; (3) Defendants did not violate Plaintiff's Eighth Amendment rights; and (4) Defendants are entitled to qualified immunity. (Doc. 103).

## II.     LEGAL STANDARD

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sierra Med. Servs. All. V. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of presenting the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party meets its burden of establishing the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000); *see* Fed. R. Civ. P. 56(c)(1). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court need only consider the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P.

56(c)(3).

In this case, there is video footage of portions of the incident giving rise to Plaintiff's excessive force claims. The Court considers the facts in the light depicted by the videos but still draws all inferences from the videos in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (noting that a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. L.V. Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.").

Additionally, Plaintiff's TAC is verified under penalty of perjury and therefore may be used as an opposing affidavit under Rule 56. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ("A verified complaint may be used as an opposing affidavit under Rule 56" if it is "based on personal knowledge and set forth specific facts admissible in evidence."); *see also Jones v. Blana*s, 393 F.3d 918, 923 (9th Cir. 2004). The Court also construes Plaintiff's pro se filings liberally. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

### III.    FACTS

Where the parties' versions of events differ, the Court views the evidence in the light most favorable to Plaintiff. *See Anderson*, 477 U.S. at 255. The Court also considers the facts as depicted by the video recordings and draws all reasonable inferences from those recordings in Plaintiff's favor. *See Scott*, 550 U.S. at 380–81.

#### a.  Events Leading to the Incident

On October 12, 2023, Plaintiff was a sentenced Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") inmate housed in the Bachman Detention Unit at ASPC-Lewis following a recent transfer from the Morey Unit. (Doc. 104 at 1–2). Plaintiff had not received his commissary items from his previous unit and was upset about it. (Doc. 104 at 2). He also complained of back pain, intermittent chest pain, and shortness of breath,

and told correctional officers he would be going back and forth to medical all day. (Doc. 104 at 2). Plaintiff then barricaded himself in his cell by covering the cell window. (Doc. 104 at 2). Based on that behavior, Plaintiff was placed on a security watch. (Doc. 104 at 2).

Plaintiff was restrained, removed from his cell, and placed in a transport chair. (Doc. 19 at 3; Doc. 104 at 3). He was secured in handcuffs, belly chains, and leg iron shackles, and strapped into the transport chair. (Doc. 19 at 3–4; Doc. 107 at 5). Officers escorted Plaintiff to a holding cell for medical evaluation. (Doc. 104 at 3). Medical staff evaluated and cleared Plaintiff, and a psychiatric associate also cleared him to return to his cell. (Doc. 20 at 4). Plaintiff was then placed in a holding cell and advised that medical staff would come to him. (Doc. 20 at 4).

### b.  The Holding Cell Incident

The parties' accounts of what occurred in the holding cell diverge sharply. (Doc. 104 at 3–7; Doc. 107 at 4–7; Doc. 109 at 30–32). Multiple video recordings capture portions of the encounter. (Doc. 104 at 25).

### i.  Video SEG_001

Video SEG_001 is approximately 14 minutes in length and depicts officers escorting Plaintiff in the transport chair to the holding cell. (Doc. 104 at 25). At approximately 0:03:56, Plaintiff stands up from the transport chair while still handcuffed and restrained with straps. Although no longer seated, Plaintiff remains tethered to the chair by his restraints and is unable to move freely. Beginning at approximately 0:04:08, multiple officers struggle to get Plaintiff back into the chair. The video shows Plaintiff acting in a verbally aggressive and physically resistant manner during this period.

At approximately 0:05:22, Plaintiff's mouth contacts COII Anaya's right upper arm. Anaya states "he just bit me." Around that same time, an officer can be heard suggesting using a taser, and Defendant Taylor responds "no, put it away." The video does not show a taser being drawn or deployed at any point.

Beginning around that same time, the video shows Defendant Taylor placing his

hands on Plaintiff's neck and upper chest area, and Defendant Taylor's arm appears around Plaintiff at various points thereafter. At 0:05:57, Plaintiff states that he cannot breathe. At approximately 0:06:20, Plaintiff again repeatedly states, "I can't breathe," while Defendant Taylor's arm is around him. At 0:07:10–0:07:22, Plaintiff again says he cannot breathe and is about to pass out while an officer's arm remains around him.

At approximately 0:08:28, Plaintiff repeatedly screams about his wrist while being held against the wall in an awkward position, still handcuffed to the chair. At 0:10:49, Plaintiff tells officers to let him go so he can sit down, and officers give him room to do so. Plaintiff sits at approximately 0:11:02 and then complains his cuffs are too tight. At 0:12:47, Plaintiff states that if officers do not loosen his cuffs, he is going to "turn it up again."

ii.  **Video SEG_003**

Video SEG_003 begins near the end of the previous recording. Plaintiff is seated in the transport chair facing the holding cell observation window, while Defendant Carter stands behind him attempting to place a spit mask on him. (Doc. 104 at 25). At approximately 0:00:07, Defendant Carter pulls his right hand away from Plaintiff's face and a snapping sound is heard. The snapping sound is consistent with Plaintiff biting Defendant Carter's latex glove and finger—photographs taken on October 19, 2023 show visible teeth marks on both sides of Carter's left index finger. (Doc. 104 at 7, 110–11). The video, however, is partially obscured by a heavy metal screen over the observation window. Investigator Armstrong noted in his report that the incident was difficult to see due to a "screen that obscures the video to a degree." (Doc. 109 at 26).

Immediately after the snapping sound, Defendant Carter's hand moves back toward Plaintiff's head, and Plaintiff says, "did you just sock me?" Plaintiff continued to complain that he had been struck. In a follow-up interview with Investigator Armstrong, Defendant Carter described the contact as a "knee-jerk reaction" and stated that there "might have been some force used when he put his hand back." (Doc. 109 at 26, 29). Defendant Carter denied punching Plaintiff, but acknowledged the "knee-jerk reaction." (Doc. 109 at 26).

Armstrong noted that the video appeared to show Defendant Carter jerking his finger away and then immediately making contact with Plaintiff's head again, accompanied by a sound at the moment of contact. (Doc. 109 at 29).

### iii. **Video SEG_006_003**

Video SEG_006-003 is approximately twenty-one minutes long and shows Plaintiff in the transport chair in the Horseshoe area surrounded by officers. (Doc. 104 at 25). At approximately 0:04:22, medical staff administer a sedation injection while Plaintiff is being held by approximately six officers. At 0:05:37, Plaintiff spits directly into the face of a correctional officer. Officers then pull Plaintiff's shirt over his face in an apparent effort to prevent further spitting. Plaintiff continues to physically resist and to tell officers they are using excessive force. At 0:09:10, Plaintiff states that he has an STD and AIDS. At 0:12:19, Lieutenant Luft directs the officers to release Plaintiff and move away, warns Plaintiff that additional disruption will result in use of the chemical fogger, and then has Plaintiff rolled into the holding cell alone after Plaintiff states that he understands.

### c. **Use of Force Review**

The incident was later reviewed by a Use of Force Review Committee. (Doc. 109 at 26–31). The Committee identified multiple deficiencies in how the incident was handled, including the failure to reattach the lap strap on the transport chair, the need for forearm straps, the need for medical staff to evaluate Plaintiff in person rather than through glass, the failure to remove Plaintiff from the holding cell sooner, poor camera positioning, the absence of a vest on one responding staff member, the failure to use a cloth mask, the fact that too many people were talking at once instead of one person giving commands, the use of Plaintiff's shirt in front of his face, and the failure to place Plaintiff on the floor. (Doc. 109 at 30–31).

### d. **Injuries**

Plaintiff alleges that, during and as a result of the incident, he suffered cuts, bruises, and lacerations to his neck, shoulders, back, legs, face, and wrist. (Doc. 19 at 5–6). He also alleges that he felt humiliated and degraded and experienced extreme anxiety, stress, and

emotional turmoil because he believed he was going to be killed. (Doc. 19 at 6). Plaintiff further asserts that he continues to suffer from extreme anxiety, difficulty sleeping, night sweats, terror, paranoia, post-traumatic stress disorder, and constant thoughts of suicide. (Doc. 19 at 6).

Defendants assert that Plaintiff's medical records show no bodily injury after the incident. (Doc. 103 at 12). But the cited records—Attachment 2 to Defendants' Statement of Facts—consist of mental-health records relating to Plaintiff's placement on suicide watch and ICS nursing responses concerning Plaintiff's preexisting complaints of chest pain and back pain. (Doc. 104 at 137–160). Those records do not document a post-incident physical examination directed at injuries allegedly caused by the use of force, and they are therefore silent as to whether Plaintiff sustained physical injuries during the October 12, 2023 incident. Neither side has submitted medical records affirmatively documenting or negating such injuries. Plaintiff was placed on a four-day security and mental-health watch following the incident. (Doc. 19 at 5; Doc. 104 at 2).

### e. Criminal Charges and Conviction

As a result of the October 12, 2023 incident, Plaintiff was charged with aggravated assault, a class 5 felony, and assault by a prisoner with bodily fluids, a class 6 felony. (Doc. 104 at 8). Plaintiff ultimately pled guilty to aggravated assault under A.R.S. § 13-1204(A)(10) and was sentenced to 2.25 years' imprisonment. (Doc. 104 at 8). The present record does not include the plea agreement, plea colloquy, or any other document identifying the specific factual basis for Plaintiff's guilty plea.

### IV. THE *HECK* BAR

Defendants argue that Plaintiff's excessive force claim is barred under *Heck v. Humphrey* 512 U.S. 477 (1994), because Plaintiff pled guilty to aggravated assault on correctional officers under A.R.S. § 13-1204(A)(10) arising from the same October 12, 2023 incident. (Doc. 103 at 5–9). Defendants contend that a judgment in Plaintiff's favor on his excessive force claim would necessarily imply the invalidity of his criminal conviction. (Doc. 103 at 5–9).

Under *Heck*, a § 1983 claim for damages is barred if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. The Ninth Circuit Court of Appeals requires courts to identify the specific factual basis of the conviction and then assess whether the alleged excessive force is temporally or spatially distinct from the conduct underlying that conviction. *Smith v. City of Hemet*, 394 F.3d 689, 699 (9th Cir. 2005) (en banc); *Cunningham v. Gates*, 312 F.3d 1148, 1153–55 (9th Cir. 2002). Where there is no "break in the action" between the plaintiff's criminal conduct and the officers' alleged use of excessive force, success on the § 1983 claim may necessarily imply the invalidity of the conviction. *Cunningham*, 312 F.3d at 1154–55.

The Court recognizes that the undisputed record strongly suggests that Plaintiff's conviction arose from the same continuous encounter in which the challenged force occurred. The video recordings depict a single, unbroken chain of events—Plaintiff's resistance, his assault on officers, and the officers' responsive use of force all occurred in rapid succession without any meaningful pause or separation. On this record, the Court could reasonably infer that a *Heck* bar applies.

But inferences cannot be drawn in the movant's favor at summary judgment. Defendants bear the burden on their affirmative defense, and it is Defendants' obligation to establish the factual predicate for the *Heck* bar. *See Washington v. Los Angeles County Sheriff's Dep't*, 833 F.3d 1048, 1056 n.5 (9th Cir. 2016); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The threshold step in the *Heck* analysis is identifying the specific conduct that formed the factual basis of the plaintiff's conviction. *See Smith*, 394 F.3d at 698–99. Yet Defendants did not submit the plea agreement, the plea colloquy, or any document identifying what conduct Plaintiff admitted to when he pled guilty. The Court therefore does not know whether Plaintiff admitted to biting COII Anaya, biting Defendant Carter, spitting, head-butting, or some combination—nor does the Court know at what point during the incident the admitted conduct occurred.

Without this information, the Court cannot determine whether the force Plaintiff challenges arose from the "same acts" as his conviction or whether success on his § 1983

claim would "necessarily imply" its invalidity. *See Smith*, 394 F.3d at 698–99 (declining to apply *Heck* where "nothing in the record informs us what the factual basis for [plaintiff's] plea was"); *Cunningham*, 312 F.3d at 1153–55. The Court will not supply the missing evidence by drawing inferences in favor of the party that bears the burden of proof on this issue. *See Celotex*, 477 U.S. at 323.

Accordingly, Defendants have not carried their burden of establishing that the *Heck* bar precludes Plaintiff's claims. The Court will proceed to consider the merits of Plaintiff's Eighth Amendment claim.

## V.    EIGHTH AMENDMENT EXCESSIVE FORCE

A prisoner's excessive-force claim arises under the Eighth Amendment. The question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically" to cause harm. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *see also Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). In making that determination, courts consider the extent of injury, the need for force, the relationship between that need and the force used, the threat reasonably perceived, and efforts to temper the response. *See Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013). Prison officials are entitled to wide-ranging deference in responding to disturbances that threaten institutional order and staff safety. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Whitley*, 475 U.S. at 321.

Defendants argue that Plaintiff's account of the incident in this case is blatantly contradicted by the video recordings under *Scott v. Harris*, 550 U.S. 372, 380 (2007). (Doc. 103 at 5). But *Scott* sets a high bar. Where the video is ambiguous, partially obscured, or open to competing inferences, ordinary summary-judgment principles still govern. The Court has reviewed the recordings and applies *Scott* defendant by defendant.

The undisputed evidence shows that Plaintiff was verbally aggressive, physically resistant, and at times assaultive toward the officers. The question is not whether officers faced a threat, but whether the particular force challenged here was used in good faith to restore discipline or maliciously and sadistically to cause harm.

### a. **Defendant Alfaro**

Plaintiff alleges that Defendant Alfaro drew a taser, asked whether he should use it, and tased Plaintiff while Plaintiff was restrained in the transport chair. (Doc. 19 at 4.) The video and audio do not support that claim. Video SEG_001 captures an officer suggesting use of a taser, followed by Defendant Taylor directing, "no, put it away." (Doc. 104 at 25, Video SEG_001 at 0:05:22.) The recording does not show a taser being drawn or deployed, and Plaintiff shows no visible reaction consistent with being tased. On this record, Plaintiff's allegation that Defendant Alfaro used a taser is indisputably contradicted by the video evidence, and no reasonable jury could find otherwise. *See Scott*, 550 U.S. at 380. Because the use of the taser is the only excessive force allegation against Defendant Alfaro, summary judgment will therefore be granted in Alfaro's favor.

### b. **Defendant Taylor**

Plaintiff alleges that Defendant Taylor twice placed him in a chokehold while he was restrained in the transport chair. (Doc. 19 at 4). Defendants deny that any chokehold was used and contend that Defendant Taylor employed only reasonable control techniques in response to an actively combative inmate. (Doc. 103 at 2–3, 11–12).

First, the extent of injury is essentially neutral. Plaintiff's verified complaint alleges cuts, bruises, and lacerations to his neck, as well as ongoing psychological injuries. (Doc. 19 at 5–6). Defendants assert that medical records show no bodily injury (Doc. 103 at 12), but the records cited are mental health and suicide watch records that do not reflect a post-incident physical examination for use-of-force injuries. (Doc. 104 at 137–160). Neither party has submitted medical records directly addressing injuries from the incident. *See Wilkins*, 559 U.S. at 37 (holding that the extent of injury is "relevant to the Eighth Amendment inquiry, but does not end it" and that an inmate "does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury").

Second, there was a significant need for force. Plaintiff was verbally aggressive, physically resistant, struggled with officers, bit COII Anaya, repeatedly refused orders, and

threatened to escalate. (Doc. 104 at 3–4, 25, Video SEG_001 at 0:03:56–0:05:22). This factor weighs in Defendant Taylor's favor.

Third, the proportionality of the force presents a genuine dispute. The video shows Defendant Taylor placing his hands on Plaintiff's throat and neck area and his arm around Plaintiff at various points between 0:05:22 and 0:08:32, during which Plaintiff repeatedly stated he could not breathe. (Doc. 104 at 25, Video SEG_001 at 0:05:57, 0:06:20, 0:07:10–0:07:22). A reasonable jury could view this as good-faith control of a dangerous inmate. A reasonable jury could also conclude that sustained holds on a handcuffed, chair-tethered prisoner's throat exceeded what was necessary. Because the video is open to competing inferences on that point, the Court may not resolve the dispute as a matter of law under *Scott*. This factor is significant because the relationship between the need for force and the amount of force used is directly probative of whether force was applied in good faith or with malicious and sadistic intent. *See Hudson*, 503 U.S. at 7; *Hoard v. Hartman* , 904 F.3d 780, 788 (9th Cir. 2018).

Fourth, Defendant Taylor reasonably perceived a significant threat. Plaintiff had bitten an officer, was physically struggling with multiple officers, and was threatening to escalate—all in a confined space. (Doc. 104 at 3–4). The fact that Plaintiff was tethered to the chair mitigates but does not eliminate the threat. This factor weighs in Defendant Taylor's favor.

Fifth, Defendant Taylor made meaningful efforts to temper his response. He rejected the taser, attempted verbal de-escalation, and gave Plaintiff room to sit voluntarily. (Doc. 104 at 3–4, 25, Video SEG_001 at 0:10:49). This factor weighs slightly in Defendant Taylor's favor, although the continued neck holds during repeated breathing complaints cuts the other way.

Most factors favor Defendant Taylor, and the Court affords appropriate deference to officers confronting a combative inmate in a confined space. *See Whitley*, 475 U.S. at 320–21. But the proportionality question goes directly to whether force was applied in "good faith . . . or maliciously and sadistically to cause harm." *Hoard*, 904 F.3d at 788.

Because a reasonable jury could draw competing inferences from the video on that question, summary judgment is denied as to Defendant Taylor.

### c. Defendant Carter

Plaintiff alleges that Defendant Carter struck him in the head and then applied body weight to his head and neck. (Doc. 19 at 4–5). Defendants contend Defendant Carter was simply trying to regain control after Plaintiff bit Defendant Carter's finger during an attempt to place a spit mask. (Doc. 103 at 3; Doc. 104 at 4–5).

As with Defendant Taylor, the injury evidence is limited and does not strongly favor either side. *See Wilkins*, 559 U.S. at 37.

Second, there was a need for force. Defendant Carter was attempting to place a spit mask on Plaintiff when Plaintiff bit his finger, leaving visible teeth marks photographed a week later. (Doc. 104 at 110; Doc. 109 at 26). This factor weighs in Defendant Carter's favor.

Third, the relationship between the need for force and the amount of force used is, as with Defendant Taylor, the factor most directly probative of whether the force was applied in good faith or with malicious intent. *See Hudson*, 503 U.S. at 7; *Hoard*, 904 F.3d at 788 (identifying "officer intent" as "the core dividing factor between constitutional and unconstitutional applications of force"). Video SEG_003 at 0:00:07 shows Defendant Carter pulling his hand away, followed by his hand moving back toward Plaintiff's head with a sound at contact, and Plaintiff immediately saying, "did you just sock me?" (Doc. 104 at 25, Video SEG_003 at 0:00:07). The video is partially obscured by the metal screen. (Doc. 109 at 26). Defendant Carter described the contact as a "knee-jerk reaction" and acknowledged "there might have been some force used." (Doc. 109 at 26, 29). A reasonable jury could find this was a reflexive strike rather than a measured control technique—and that distinction goes directly to whether Defendant Carter acted in good faith or with the intent to cause harm. This factor presents a genuine dispute.

Fourth, Defendant Carter reasonably perceived an immediate threat. He had just been bitten during an active struggle, and the entire sequence occurred in seconds. This

factor weighs in Defendant Carter's favor.

Fifth, there is no evidence Defendant Carter tempered his response. His own "knee-jerk reaction" description suggests an impulsive rather than measured response. This factor does not favor Defendant Carter.

As with Defendant Taylor, most factors favor Defendant Carter, and the Court recognizes the deference owed to officers responding to a dangerous and rapidly evolving situation. *See Whitley*, 475 U.S. at 319.  But the proportionality dispute—combined with Defendant Carter's own admission that his response was a "knee-jerk reaction" rather than a deliberate control technique—creates a triable question as to whether the force was applied in good faith to restore discipline or reflexively with the intent to cause harm. *See Hoard*, 904 F.3d at 788. Summary judgment is denied as to Defendant Carter.

## VI.    QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity. (Doc. 103 at 14–16). Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–32 (2009). All disputed facts are viewed in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017). The inquiry requires "a high degree of specificity," and principles stated generally—such as that "an officer may not use unreasonable and excessive force"—do not suffice. *Zorn v. Linton*, 607 U.S. ___ (2026) (slip op., at 3–4) (quoting *Wesby*, 583 U.S. at 63); *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam). Prison officials are entitled to "wide-ranging deference" in this analysis. *Whitley*, 475 U.S. at 321–22; *Norwood v. Vance*, 591

F.3d 1062, 1066–67 (9th Cir. 2010).

The Court has already determined there are triable issues of fact on whether Defendants Taylor and Carter violated Plaintiff's Eighth Amendment rights. Qualified immunity therefore turns on the second prong—whether the law was clearly established such that every reasonable officer in each Defendant's position would have known the specific conduct challenged was unlawful.

### a. Defendant Taylor

The undisputed facts establish that Plaintiff was actively combative throughout the encounter—he bit two officers, stood up from the chair and struggled with multiple officers, repeatedly refused orders, and threatened to escalate. (Doc. 104 at 25, Video SEG_001 at 0:04:08, 0:05:22). Defendant Taylor was responding to a genuine, evolving security threat in a confined space. The specific force at issue—upper body control holds including contact with the neck and chest area—was applied while Plaintiff was actively struggling, even though he remained tethered to the chair. Defendant Taylor demonstrably tempered his response by rejecting the taser, attempting verbal de-escalation, and giving Plaintiff room to sit voluntarily. (Doc. 104 at 25, Video SEG_001 at 0:05:22, 0:07:18, 0:10:49).

Plaintiff repeatedly stated he could not breathe during the encounter. (Doc. 104 at 25, Video SEG_001 at 0:05:57, 0:06:20, 0:07:10–0:07:22). However, the video shows Plaintiff making these statements while simultaneously yelling, screaming, and making threats—conduct that would reasonably cause an officer to question whether the complaints were genuine or tactical.

The Ninth Circuit Court of Appeal's decision in *Simmons v. G. Arnett* supports qualified immunity here. 47 F.4th 927 (9th Cir. 2022). In *Simmons*, the court granted Qualified Immunity to an officer who used non-lethal force on an inmate during an active struggle, emphasizing the deference owed to officers responding to volatile prison disturbances and the absence of clearly established precedent prohibiting the specific force used under analogous circumstances. *Id.* at 933–35. The cases that clearly establish liability

for force against restrained prisoners involve fundamentally different facts. Specifically, unprovoked attacks on passive prisoners (*Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991)), deliberate use of weapons on completely motionless prisoners (*Changamu v. Lamb*, No. CV-22-01598-PHX-DGC (JFM), 2025 WL 460912, at *11–12 (D. Ariz. Feb. 11, 2025)), or officers ignoring complaints for hours with no penological justification (*id.* at *8–9). None is analogous to an officer using physical control holds on an actively combative, biting inmate during a rapidly evolving confrontation.

No Supreme Court or Ninth Circuit authority clearly establishes that the use of upper body control holds—including contact with the neck and chest area—on an actively struggling, biting inmate tethered to a transport chair violates the Eighth Amendment.

Accordingly, Defendant Taylor is entitled to qualified immunity. Summary judgment is therefore granted in favor of Defendant Taylor on qualified immunity grounds.

### b. Defendant Carter

The Court likewise concludes that Defendant Carter is entitled to qualified immunity. The undisputed facts establish that Defendant Carter was attempting to place a spit mask on Plaintiff—a necessary task given that Plaintiff had been spitting on officers and claimed to have STDs and AIDS. (Doc. 104 at 25, Video SEG_006_003 at 00:09:10). Plaintiff bit Defendant Carter's finger during the attempt, leaving visible teeth marks. (Doc. 104 at 110; Doc. 109 at 26). Defendant Carter pulled his hand away and made contact with Plaintiff's head almost immediately. (Doc. 104 at 25, Video SEG_003 at 0:00:07). The entire sequence occurred in seconds.

Defendant Carter's description of the contact as a "knee-jerk reaction" (Doc. 109 at 26) does not defeat qualified immunity—it supports it. A knee-jerk reaction is instinctive and involuntary, not the deliberate, malicious conduct the Eighth Amendment prohibits. It is precisely the kind of split-second response that *Whitley* instructs courts not to second-guess in hindsight. 475 U.S. at 319. The analysis in *Changamu* is directly on point—there, the court granted summary judgment to the officer on a knee strike delivered in less than a second when a prisoner suddenly disrupted an escort, finding that even if the force was

more than necessary, it did not evidence a constitutional violation. 2025 WL 460912, at *10.

No clearly established precedent holds that an officer who has just been bitten by a combative inmate violates the Eighth Amendment by making immediate reflexive contact with the inmate's head in a reaction lasting less than a second.[2] Accordingly, Defendant Carter is entitled to qualified immunity.

## VII. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** withdrawing the reference to the Magistrate Judge on the pending Motion for Summary Judgment (Doc. 103).

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment (Doc. 103) is granted in part and denied in part as follows:

(a) The Motion is denied as to the *Heck* bar. On this record, Plaintiff's claims are not barred by *Heck*.

(b) The Motion is granted as to Defendant Alfaro; Plaintiff's excessive force claim against Defendant Alfaro is dismissed with prejudice.

(c) The Motion is denied insofar as it seeks summary judgment on the merits of the Eighth Amendment excessive force claims against Defendants Taylor and Carter.

(d) Defendants Taylor and Carter's[3] motion for summary judgment based on qualified immunity is granted on Plaintiff's excessive force claims.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2] For purposes of the Qualified Immunity analysis, the Court has taken Plaintiff's facts as true that contact with Plaintiff's head occurred. However, as discussed above, it is unclear from the video if this actually happened.

[3] Because Defendant Alfaro's motion for summary judgment was granted on the merits, the Court did not reach Defendant Alfaro's qualified immunity defense.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendants and terminate this action.

Dated this 21st day of April, 2026.

James A. Teilborg
Senior United States District Judge